**In re D.M., Don. M., Appellant.**

**Nos. 98–FS–1546, 98–FS–1547.**

District of Columbia Court of Appeals.

Argued Feb. 27, 2001.
Decided April 12, 2001.

Donald M. Temple, Washington, DC, for appellant.

Sheila Kaplan, Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for the District of Columbia.

Deborah D. Boddie, Washington, DC, filed a memorandum in lieu of brief for D.M.

Before STEADMAN, SCHWELB, and, RUIZ, Associate Judges.

Schwelb, Associate Judge:

Childhood is precious, and the premature loss of innocence can be tragic. This is such a case. The respondent, D.M., now almost sixteen years of age, was abused by her mother and removed from her home a few months after her fifth birthday. Notwithstanding two unsuccessful attempts to reunify the family, D.M. has spent well over half her life in foster care. At the age of twelve, while residing at one of her foster homes, D.M. gave birth to a daughter of her own; the child's alleged father, a boy not much older than D.M., was the nephew of D.M.'s foster mother. D.M. has had no contact with her mother for many years, and her own child lives with relatives of the young father.

Presently before the court are two separate appeals by D.M.'s mother from an order of the trial court entered on September 1, 1998. In that order, the judge refused to modify an earlier ruling in which she had barred any visitation between D.M. and her mother, and she also prohibited any visitation between D.M. and her mother's sister, D.M.'s aunt. In addition, the judge declined to order an investigation, proposed by counsel for the mother, into the circumstances of D.M.'s pregnancy and motherhood, concluding that there was

no evidence that D.M. had been sexually abused. In Appeal No. 98–FS–1546, the mother contends that the trial judge abused her discretion by continuing to prohibit visitation. In No. 98–FS–1547, the mother attempts to challenge the judge's refusal to order the requested investigation.

The results of D.M.'s commitment to the Department of Human Services (DHS), and of her placement in foster care, have been less than ideal. The best interests of an abused child cannot be said to have been achieved when she has become pregnant, and then a mother, at the age of twelve, all while living in a foster home to which she was sent to protect her from harm. With respect to the judge's disposition of the specific and very limited issues now before us, however, we discern no abuse of discretion or error of law.

## I.

D.M. was born on June 30, 1985. For the first five years of her life, she lived with her mother.[1] On October 17, 1990, she came to school with welt marks on her face and chest and above her right eye. It appears that the mother had beaten D.M. with a belt and had hit and kicked her in the face. The mother admitted that she had physically disciplined her daughter for being "hard-headed."

D.M.'s teacher called the police, and D.M. was taken into protective custody. By order of the Superior Court, she was placed in a foster home pending further proceedings. D.M. was subsequently found to be a neglected child, and she was committed to the custody of DHS. From 1990 until 1996, D.M. was in and out of foster care. Representatives of DHS attempted to work towards reunification of D.M. with her mother and with her younger brother, who was born in 1990. For two separate periods some five years apart, D.M. was placed in her mother's home under the protective supervision of the court. Neither attempt at reunification was successful.[2]

On July 18, 1996, the judge, having concluded that the prospects for reunification were unfavorable, ordered representatives of the District to initiate the process for terminating the mother's parental rights. Evidently in an attempt to keep all options open, however, the judge also ruled that the mother should be permitted to have supervised visitation with D.M. Subsequently, on November 20, 1996, a hearing

---

1. The present whereabouts of D.M.'s father are apparently unknown, and she has had little, if any, contact with him.

2. On March 25, 1991, the Superior Court ordered that D.M. be placed with her mother, upon the condition that the mother refrain from "exercising physical discipline on the respondent." The mother failed to comply with this condition, however, and while D.M. was living with the mother, she suffered multiple bruises to her upper left thigh and lower stomach, apparently as a result of having been beaten by her mother with a belt. On January 25, 1992, the court ordered that D.M. be returned to her previous foster home, where she had developed a favorable relationship with the foster mother, Robin Gaines.

From January 25, 1992 to December 22, 1995, D.M. remained in foster care, first with Ms. Gaines and then in another home. During this period, the mother was afforded reasonable rights of visitation. The visits did not always go well, however, and the mother physically abused D.M. on several occasions. Nevertheless, on December 22, 1995, the judge terminated D.M.'s commitment to DHS and placed her in the custody of the mother under the protective supervision of the court. This attempt at reunification lasted only two months, for on February 20, 1996, D.M.'s commitment was reinstituted at the mother's request. The mother asserted, *inter alia*, that D.M. had caused a dog to lick the penis of D.M.'s younger brother, then five years of age. D.M. denied this allegation.

was held during which, by consent of the parties, the judge interviewed D.M. in chambers. The following day, on the basis of this interview and the other facts before her, the judge ordered that visitation between D.M. and her mother be denied until further order of the court.

In November 1996, D.M. was eleven and one half years old. Although the record is not quite clear on the point, the mother alleges that, by this time, D.M. had already become sexually active. In any event, D.M. became pregnant during the autumn of 1997. In March 1998, some six months into the pregnancy, D.M.'s condition was brought to the attention of the court, and it appears that DHS representatives proposed a surgical procedure to end the pregnancy. The mother, who fainted in the courtroom after she was made aware of D.M.'s plight, declined to consent, and no abortion was performed.[3] The court ordered that D.M. be placed in a therapeutic foster home at which mental health services could be provided.

D.M.'s daughter, A.M., was born in June 1998, shortly before D.M.'s thirteenth birthday. The report of a psychological

3. The Superior Court's jacket entry for March 9, 1998, reveals that an "emergency hearing regarding a medical procedure" was held on that day, that the court "heard oral and sworn representations from all parties," and that "proceedings were stopped due to the mother fainting in the courtroom and requiring medical attention." On the following day, the judge "denie[d] the requested medical procedure."

According to the mother's pleading in her federal suit against the District of Columbia, these events occurred in the following manner:

On March 6, 1998, the plaintiff was summoned to the Family Division of the Superior Court for an "emergency hearing." When she arrived, without counsel, who DHS knew was out of town and was unavailable for a March 6 hearing, plaintiff was advised for the first time that her daughter, whom she had not been allowed to see for over a year, was pregnant. When plaintiff inquired as to how that could have occurred, she was advised that her child had been impregnated by a family member of her foster parent.

After making plaintiff aware of this shocking development, DHS and D.M.'s court-appointed Guardian *ad litem* then sought to have plaintiff sign a parental consent to allow her daughter to have an abortion. When plaintiff balked at providing consent for an abortion for her 12–year–old daughter, the "emergency hearing" was continued to March 9, 1998 for hearing when plaintiff's counsel would be back in town and could attend. Having learned of her daughter's pregnancy, plaintiff requested to see or at least speak with her daughter. DHS continued to oppose any such contact and plaintiff's request was denied.

When the so-called "emergency hearing" was reconvened, plaintiff's daughter was brought into the courtroom. Plaintiff noted at the time that she was obviously pregnant and exhibited a greatly extended abdomen. Plaintiff was not, however, prepared for what would come to light about what had been already told to her child about the abortion procedure by DHS, and/or her Guardian *ad litem*. As it became apparent that her 12 year old child had been made aware that a needle would be stuck in her stomach and into the heart of her baby to *kill it, plaintiff fainted in the courtroom* and had to be revived by medical personnel. No one had bothered to even mention D.M.'s pregnancy to the plaintiff, let alone speak with her about an abortion proceeding on her 12 year old child. Yet, her child had already been advised that her baby was going to be killed so that she could continue to go to school.

As D.M. was left to contemplate these developments in her life, and presumably wrestle with the idea of a baby being killed inside her body, she was forced to do so without solace and counsel from her family who still are not being allowed to interact with this pregnant child. Neither plaintiff nor anyone in her family is being allowed any involvement whatsoever in the decision being made regarding D.M.'s care or the possibilities regarding D.M.'s unborn child. Complaint in *D.M. v. District of Columbia*, No. 1: 98–CV–00856 (D.D.C.), paragraphs 15–18.

evaluation of D.M. conducted soon after the birth of her baby confirms that A.M.'s father was a nephew of the foster mother with whom D.M. was living at the time that she became pregnant. A.M. was placed in the custody of D.M.'s foster mother, who was the aunt of the child's father, and who was in charge of the foster home in which D.M. had become pregnant at the age of twelve.

These events precipitated legal action on two fronts. On April 3, 1998, after having secured new counsel, D.M.'s mother, described in her pleading as D.M.'s "next-best friend," filed a complaint against the District in the United States District Court for the District of Columbia. See note 3, *supra.* In this action, the mother sought several millions of dollars in damages for "deprivation of civil rights, negligent training and supervision, and negligent infliction of emotional distress." On June 17, 1998, the mother's attorneys in the federal suit, who had entered an appearance on her behalf in the Superior Court proceeding, filed a motion in the present case which was styled as follows:

> Emergency Motion for Immediate Modification of the Court's Order Regarding Family Reunification and Family's Visitation Rights and to Order an Investigation and Report Regarding Circumstances Surrounding [D.M.'s] Possible Sexual Abuse, Pregnancy and Paternity

On September 1, 1998, the trial judge denied the mother's motion in a thirteen-page written order. These appeals followed.

## II.

### THE VISITATION ISSUE

A. *Jurisdiction.*

◼ In Appeal No. 98–FS–1546, the mother appeals from that part of the trial judge's order which maintained in effect the judge's previous prohibition against visitation by D.M.'s mother and which denied visitation rights to D.M.'s aunt. Before reaching the merits of the mother's appeal, we must first determine whether we have jurisdiction to entertain it. "[W]here a substantial question exists as to this court's subject matter jurisdiction, it is our obligation to raise it, *sua sponte,* even though[, as here,] no party has asked us to consider it." *Murphy v. McCloud,* 650 A.2d 202, 203 n. 4 (D.C.1994) (citations omitted). "Without jurisdiction, the Court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (quoting *Ex parte McCardle,* 74 U.S. (7 Wall) 506, 514, 19 L.Ed. 264 (1869)); *cf. Childs v. United States,* 760 A.2d 614, 617 & n. 4 (D.C.2000).

◼ The mother has not invoked any interlocutory appeal statute, and the question before us is whether the prohibition against visitation is appealable as a final order. "An order is final only if it disposes of the whole case on its merits, so that the court has nothing remaining to do but to execute the judgment or decree already rendered." *In re Estate of Chuong,* 623 A.2d 1154, 1157 (D.C.1993) (en banc) (internal quotation marks omitted) (quoting *McBryde v. Metro. Life Ins. Co.,* 221 A.2d 718, 720 (D.C.1966)). "To be reviewable, a judgment or decree must not only be final but also complete, that is, final not only as to all parties, but as to the whole subject matter and all the causes of action involved." *District of Columbia v. Davis,* 386 A.2d 1195, 1198 (D.C.1978) (citations omitted). "[T]he general rule is that the order stating the sanction, quantum of relief, or the like is the one with requisite

finality." *Trilon Plaza Co. v. Allstate Leasing Corp.*, 399 A.2d 34, 36 (D.C.1979). As the court explained in *Trilon Plaza*,

the statute [does not] permit appeals from orders where they are but steps toward final judgment in which they will merge. The purpose is to combine in one review all stages of the proceeding that effectively may be reviewed and corrected if and when final judgment results.

*Id.* at 37 (quoting*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)) (internal brackets and ellipsis omitted).

The order from which the mother has noted her two appeals states, in pertinent part, as follows:

ORDERED, that permanency planning shall continue to move forward with the goal of adoption without further reunification attempts; and it is further

ORDERED, that the Court's Order of November 21, 1996 shall remain unmodified; and it is further

ORDERED, that visitation with Movant [Don. M.], the Respondent's natural mother, or with [B.T.M.], the Respondent's maternal aunt, is DENIED; and it is further

ORDERED, that further investigation of sexual abuse, pregnancy and paternity is DENIED.

Obviously, the judge's order did not dispose of everything in the case that could be litigated in the future, for "permanency planning" was to continue, with adoption the goal. The broader controversy cannot be deemed to have been fully resolved until the issues of termination of parental rights (TPR) or adoption have been finally decided. But as of the time of the judge's order, no motion for termination of parental rights had been filed, and no petition to adopt D.M. was pending. Although, at least potentially, much more remained to

be done in the case, there was no unresolved motion awaiting decision.

■ Under these circumstances, in our view, a mother who has been denied all contact with her child is not precluded from challenging that denial on appeal until her parental rights have been terminated or an order of adoption has been entered. *Cf. Murphy, supra,* 650 A.2d at 203–06 (order declaring that claimant has an interest in estate is appealable even though administration of estate is continuing). In *In the Interest of N.D.,* 857 S.W.2d 835, 842 (Mo.Ct.App.1993), the court stated:

There is no connection between the issues in the denial of visitation and the petition for termination of parental rights sufficient to require that they be combined in a single appeal. The rights at stake are significant and the best interest of children is served by resolving juvenile matters promptly, particularly when the effect of the order sought to be appealed is to deny contact between a parent and child.

(Citation omitted.) We agree. To hold that the mother's right to appeal must await the completion of hypothetical TPR or adoption proceedings, which may or may not be instituted at some time in the future, would permit her fundamental rights as a parent to be denied or impaired indefinitely, and perhaps forever, without appellate review. In this case, the judge's order was final with respect to the very significant visitation issue, and we agree with the court in *N.D.* that this was sufficient for purposes of appellate jurisdiction.

We recognize that the mother was first denied visitation privileges by the trial judge's order of November 21, 1996. No appeal was taken from the 1996 order. As to the issue of visitation by the mother, the order now on appeal does no more than

maintain the 1996 ruling in effect. But in support of her present appeal, the mother relies primarily on a series of events, all relating to D.M.'s pregnancy, potential abortion and motherhood, that had not occurred in 1996, and which therefore could not have been cited to or considered by the court during the 1996 proceedings. The judge's 1998 decision prohibits visitation under entirely new circumstances, and the mother has the right to appellate review of the denial of visitation on the record as it existed in 1998, not in 1996.

This case differs in fundamental respects from *In re S.J.*, 632 A.2d 112 (D.C. 1993) (per curiam). In *S.J.*, the trial court found probable cause to believe that the respondent, a minor child, had been neglected. The court ordered that the respondent be placed in shelter care pending a factfinding hearing on the allegations of neglect. The respondent's mother filed an interlocutory appeal pursuant to D.C.Code § 16–2328(a), seeking summary reversal of the shelter care placement. This court dismissed the appeal, noting that the statutory provision relied upon by the mother authorized interlocutory appeals by the child, but not by the parent. We also concluded that there was no constitutional violation, for "the deprivation of custody alleged by the mother is temporary and subject to a full factfinding hearing at which the government must prove its allegations by a preponderance of the evidence." *Id.* In the present case, the mother has not placed her reliance on a statute that permits an immediate appeal by a child but not by a parent. Moreover, the denial of visitation has continued for more

than four years, and it cannot fairly be characterized as temporary.[4]

### B. *The merits.*

■■ Turning to the merits of the visitation issue, we begin by noting that our standard of review is deferential. "[T]he proper disposition of an abused child is committed to the sound discretion of the trial court, and ... the trial court's exercise of discretion is reviewable only for abuse." *In re S.L.E.*, 677 A.2d 514, 519 (D.C.1996) (citation omitted). "[T]he decisive consideration is the best interests of the child," *id.*, and "[t]he judges of the trial court have broad authority to take whatever steps are necessary to protect the well-being of neglected and abused children." *Id.* at 522.

■ As the trial judge explicitly recognized, our "statutory scheme presumes that contact with both parents is normally in the best interests of the child." *In re M.D.*, 602 A.2d 109, 114 (D.C.1992). A parent's right of visitation, however, is not absolute. *Id.* In this case, the trial judge found, on the basis of reports by D.M.'s therapists and social workers, that visits with her mother had "detrimental effects" on D.M., and that forced visitation would place D.M.'s emotional welfare at risk. Further, the judge noted that, as a result of the history of abuse by the mother, D.M. "has consistently stated to her counselor, to her social worker, to her guardian *ad litem*, and to her attorney that she does not wish to visit with her mother or her aunt."[5]

4. In *In re Kaiser*, 9 Or.App. 396, 496 P.2d 249, 250 n. 2 (1972), the court noted that an order prohibiting visitation *pendente lite* was not immediately appealable. As in *S.J.*, however, the restriction at issue in *Kaiser* was far more limited in duration than the order presently before us. Moreover, the result in *Kai-*

*ser* was predicated on the particular phrasing of the Oregon statute.

5. A single visit between D.M. and her aunt had not gone well, and D.M. made it clear that she wanted no further contact with the aunt.

There is ample support in the record for the foregoing findings. Dr. Marty Beyer, a psychologist who labored tirelessly to find a way to make D.M. and her mother more accepting of one another, nevertheless concluded in her report to the court that "it puts [D.M.] at risk emotionally to force her to visit with her mother." According to Dr. Beyer, D.M. was "so adamant about not seeing her mother, even with my protection, that I was not able to observe them together." D.M. told Dr. Marcia L. Gustafson that her mother used to hit her, threatened her "not to tell," and treated her "like a slave." When asked to express her three greatest wishes, D.M.'s first was "that my mom would be poofed out of the picture." The record thus demonstrates beyond peradventure that the mother's abuse of D.M. had intense and lasting consequences, and that D.M., by now an adolescent, did not want her mother to play any role in D.M.'s life. One might well view this as a sad development, but feelings are facts.

Moreover, the trial judge did not order an end to visitation until after the agency's efforts, over an extensive period, to promote reunification of the family had failed to make any appreciable progress towards that end.[6] Congress has recognized, and so has this court, that protracted retention in foster care is not in a neglected child's best interest, and that, where possible, the child should promptly be provided with a permanent home with permanent parents, whether biological or adoptive. *See, e.g., In re Application of L.L.,* 653 A.2d 873, 887–89 (D.C.1995).[7] Under these circumstances, we cannot fault the trial judge for her focus on adoption, a goal which would necessarily involve the attenuation or elimination of any remaining ties between D.M. and her birth parent. We therefore conclude that the judge did not abuse her discretion in her disposition of the visitation issue.

In so holding, we recognize that the mother's concern over the events of late 1997 and early 1998 was entirely understandable. When the mother fainted in a Superior Court courtroom in March 1998 after seeing her twelve-year-old daughter six months pregnant, and after learning that an abortion was being contemplated at this stage of the pregnancy, the anguish that led to the mother's physical collapse was not at all astonishing. The ostensible purpose of removing D.M. from her mother's home, of committing her to the custody of the DHS, and of placing her in foster care had been to promote D.M.'s best interests and, above all, to protect her from harm. As events turned out, a consequence of the governmental intervention in D.M.'s case was to expose her to sexual activity at far too early an age, to the risk of an abortion late in the pregnancy, and to motherhood before her thirteenth birthday.[8] The mother's physical and other

---

6. A January 22, 1998 report to the court by D.M.'s social worker concluded as follows: The agency continues to be perplexed at the extraordinary efforts that continue to be maintained after eight years that this case has been known to the court or to the agency and the goal still being reunification. We respectfully request that the next court hearing be a permanency hearing to finalize and address ambiguities that still remain in the case.

7. "The central purpose of the [federal Adoption Assistance and Child Welfare Act, 42 U.S.C. §§ 670 *et seq.*] is to remove children from long term foster care, either by uniting them with their parents or by placing them with adoptive parents or in some other permanent arrangement." *L.L., supra,* 653 A.2d at 888 (citation omitted).

8. In her suit against the District in the United States District Court, the mother claims, in essence, that her daughter's pregnancy and its aftermath were the proximate result of negligence on the part of employees and agents of the District. That issue is not before us, and

abuse of D.M. was indefensible and undoubtedly warranted the protective actions taken by the court. Nevertheless, the mother believed that her daughter's premature sexual experience and motherhood while in foster care left D.M. with scars which will remain with D.M. forever.

We do not, however, discern any appreciable nexus between the mother's understandable grievance described above and the merits of the visitation issue. The judge's reasons for denying visitation—the mother's past abuse of D.M., D.M.'s continued implacable opposition to contact with her mother and aunt, the failure of extensive efforts to reunify the family, and the need to move towards adoption—are all unaffected by the events of late 1997 and the first half of 1998. Moreover, D.M. is no longer in the foster home where she became pregnant; indeed, she had been removed from that home prior to the issuance of the order now on appeal. There was no abuse of discretion.

### III.

### THE PROPOSED INVESTIGATION OF SEXUAL ABUSE

In her emergency motion filed on July 17, 1998, the mother asked the judge, *inter alia*, "to order an investigation and report regarding the circumstances of [D.M.'s] possible sexual abuse, her pregnancy, and paternity." In a supporting legal memorandum, the mother's counsel elaborated:

No formal reliable investigation or report regarding [D.M.'s] possible sexual abuse or sexual history has been provided to this court. Thus, the court is fully unaware of whether [D.M.] was sexually abused, and if so by whom and when. It is also fully unaware of the history of her sexual activity and the psychological implications of either sexual abuse or

we neither express nor imply any opinion

sexual involvement, including maternity at age 12, on [D.M.]. Accordingly, the court is also unaware as to what DHS and the GAL [guardian *ad litem* ] knew or should have known regarding [D.M.]. The court also does not know per scientific paternity tests the identity of the baby's father. Equally important, the Court should know the circumstances surrounding recommendation of a surgical [procedure] in the sixth month of the pregnancy. It appears that closer scrutiny of this case must be had. The record as to [D.M.] confirms that DHS has been less than vigilant in the exercise of supervision over her and that even after learning of her pregnancy, their judgments continue in that vein. This court can not at this time invest confidence in their decision making process regarding permanency absent a sound and complete record which answers the above stated and other questions.

The judge dealt with the mother's request in summary fashion, and she denied the requested relief:

The [c]ourt finds that there is no evidence of sexual abuse in this instance to warrant an investigation. The Respondent, an articulate and mature 13–year–old, has expressly said that the events surrounding her impregnation were consensual with a young male in her age range. The [c]ourt finds the Respondent's statements to be credible and does not find it incredible that the events that occurred were sexual experimentation, rather than sexual abuse. Therefore, the [c]ourt finds further investigation regarding the circumstances of the Respondent's sexual activity and pregnancy is not supported.

with respect to it.

In Appeal No. 98–FS–1547, the mother challenges the foregoing ruling. Although our analysis differs from that of the trial judge, we find no basis for reversal.

The question whether the judge's refusal to order the proposed investigation constituted an appealable order is a novel one. The judge did, in fact, interview D.M., and it is not clear what additional investigation the court (as distinguished from executive agencies such as the DHS or the police) was requested to make or had the resources to conduct. In any event, we have stated that

> [i]n common law "adversarial" jurisdictions, "the development of the facts is a task primarily assigned to counsel." *Mack v. United States*, 570 A.2d 777, 782 (D.C.1990). "[U]nder our system of laws, a judge is not an investigator; the investigative function belongs to the parties and their agents." *Davis v. United States*, 567 A.2d 36, 42 (D.C.1989) (per curiam). These principles are deeply embedded in the warp and woof of our law.

*In re A.R.*, 679 A.2d 470, 475 (D.C.1996). At least in conventional adversarial litigation, the task that the mother asked the judge to undertake thus would not fall within the conventional judicial role. The present case implicates the judge's responsibility, as *parens patriae*, to act on behalf of the child, and somewhat more active judicial participation in the development of the facts may arguably be permissible. Nevertheless, requests for generalized judicial investigations are rare, and no precedent involving such a request has been cited to us by any of the parties.[9]

As we understand the mother's position, she does not contend that the judge's refusal to order an investigation should be viewed as a final order disposing of the entire case on the merits. In her submission to the trial judge quoted on pages 368 – 369, *supra*, the mother suggested that the proposed investigation might undermine the court's confidence in "[DHS'] decision making process regarding permanency." The investigation was thus viewed by the mother's counsel as a means for challenging DHS' judgment and, perhaps, for reopening issues previously decided, *e.g.*, reunification and visitation. Counsel did not regard an order directing the requested investigation, had one been issued, as constituting the ultimate disposition of the case.

■ At oral argument, the mother's attorney conceded that the judge's refusal to order the sexual abuse investigation was interlocutory. Counsel sought to invoke the "Death Knell" exception to the finality requirement. That exception has been invoked to justify an immediate appeal from a trial judge's refusal to certify a class action, where the plaintiff seeking certification has "such a small monetary or other interest to be vindicated that [if a class action was not authorized] it would not be worth the plaintiff's time to continue the action." *Kanelos v. District of Columbia*, 346 A.2d 247, 249 (D.C.1975) (citation, internal quotation marks and ellipsis omitted). In other words, this exception applies where, if class action status is denied, the plaintiff will, as a practical matter, be unable to proceed with the litigation, so that the otherwise interlocutory ruling represents a "Death Knell" to the plaintiff's case.

■ We perceive no similarity between *Kanelos* and the present appeal. Here, the mother remains free to contest a mo-

---

9. So far as we can determine, counsel for the mother was free to request leave to depose the foster mother or her nephew, the social workers, or others with knowledge of the relevant facts.

tion for TPR, or a petition to adopt D.M., whether or not the judge orders and supervises an investigation. We therefore conclude that the judge's refusal to order the proposed investigation was neither a "Death Knell" to the mother's claims nor an appealable order.

It is true that, at the time the trial judge entered the order from which these appeals were taken, no motion to terminate the mother's parental rights was pending, and no adoption proceeding had been initiated. Thus, from the mother's perspective, if an immediate appeal could not be taken from the "no investigation" ruling, then, as a practical matter, that ruling might never become appealable. We agree that, where, as here, significant rights are at issue, the requirement of finality is not to be used to prevent a party from obtaining appellate review indefinitely or forever. For purposes of the present case, however, the problem with this reasoning is that the mother was free to move the court to grant her substantive relief— *e.g.*, to award her custody of D.M. If she filed such a motion, and if this relief were denied, the mother's challenge to the court's refusal to order an investigation would merge into an appeal from the denial of her motion for custody, *see Trilon Plaza, supra*, 399 A.2d at 37, and could therefore be entertained at that point.

But even if we were to conclude, notwithstanding the foregoing analysis, that the judge's refusal to order the proposed investigation was immediately appealable, the mother still cannot prevail. On the merits, the judge did interview D.M. in chambers, and we are satisfied that the judge did not err by declining to undertake any additional investigative responsibility. *Cf. A.R., supra*, 679 A.2d at 475–76. Moreover, by the time that the investigation was requested, D.M. was no longer living in the foster home at which the events leading to her unfortunate pregnancy had occurred. If the proposed investigation had been conducted, and if it had disclosed wrongdoing or negligence at that foster home, the logical remedy would have been to remove D.M. from that home. This removal having already been effectuated before the investigation was requested, the principal reason for conducting such an investigation had been significantly undermined in advance. The mother has not suggested any further resources or other relief that could reasonably have been forthcoming if the court had conducted the proposed investigation. There was no error.

## IV.

## CONCLUSION

For the foregoing reasons, the order appealed from is *Affirmed.*