**In re Petition of D.B.; S.B., Appellant.**

**Nos. 04–FS–1043, 04–FS–1044.**

District of Columbia Court of Appeals.

Argued June 23, 2005.

Decided July 28, 2005.

---

Hagos Haile, for appellant S.B.

Thalia E. Meltz, Potomac, MD, appointed by the court, for appellee D.B.

Laurie P. McManus, for appellees D.C. and J.W.C., Jr.

Stacy L. Anderson, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellee District of Columbia.

Before TERRY, REID and GLICKMAN, Associate Judges.

REID, Associate Judge:

In this case, appellant S.B., the biological mother of D.B., appeals from the trial court's order denying her motion to review a magistrate judge's order of judgment as untimely. S.B. challenged the order of a magistrate judge granting permanent guardianship of D.B. to the child's paternal grandparents. She argues on appeal that (1) her motion for review of the magistrate judge's order was timely pursuant to Super. Ct. Gen. Fam. R. D(e) and Super Ct. Civ. R. 6(3); (2) the order effectively and improperly terminates her right to visit her daughter; and (3) several conditions imposed on her by the magistrate judge's visitation schedule were not based on sufficient evidence.

We hold that Super. Ct. Civ. R. 6(e) applies to motions for review filed in the Superior Court under Super. Ct. Gen. Fam. R. D (e), and that S.B.'s motion was therefore timely. However, we conclude that the magistrate judge's guardianship order placing D.B. with her paternal

grandparents in New Jersey, and conditioning visitation on S.B.'s willingness to receive therapy and undergo a medication assessment, did not effectively terminate S.B.'s visitation rights. We therefore affirm the judgment of the trial court.

## FACTUAL SUMMARY

D.B. was born on February 26, 1995, to S.B. Her biological father, D.L., is presently incarcerated in Ohio and has consented to the proposed guardianship. On March 31, 2000, when D.B. was five-years-old, the District of Columbia, through the Child and Family Services Agency ("CFSA"), filed a petition in the Superior Court alleging that D.B. had been neglected based on allegations of sexual abuse. The petition asserted that D.B. had been sexually assaulted by an "unknown adult male" while "she was outside playing at her cousin's ... home," and that upon learning of the assault, S.B. failed to report the incident to the police or have D.B. medically examined as recommended by her pediatrician; moreover, she continued to leave D.B. in her cousin's care. D.B. was released to her mother on the conditions that she stay away from her cousin's home and receive therapy. S.B. entered into a stipulation of neglect on August 1, 2000.

On February 8, 2001, after a disposition hearing in the Superior Court, D.B. was removed from her mother's care and placed with her paternal aunt, S.L. S.B. was granted unsupervised visitation with her daughter at the discretion of D.B.'s social worker. On May 15, 2001, D.B. was again released to her mother, this time under the protective supervision of the Superior Court. The placement was conditioned on S.B.'s participation in weekly therapy classes, D.B.'s participation in both individual and family therapy classes,

and that D.B. continue to receive her daily medication.

D.B. remained with her mother until January 11, 2002, at which time she was removed from her mother's care because the Superior Court found that she was "not getting [her] medicine" and she was "not going to school." D.B. was placed in a therapeutic foster home. On February 5, 2002, S.B. entered into a second stipulation, acknowledging that she had failed to comply with the terms of the court's February 8, 2001 dispositional order. S.B. admitted that she had failed to take D.B. "to many of her therapy sessions" and "most of the family therapy [sessions]," and that during the 2001–2002 school year, D.B. had "been absent 21 times and tardy 32 times." The Superior Court revoked protective supervision and committed D.B. to the care of the CFSA. On April 30, 2002, the case was transferred to a magistrate judge.

The permanency goal, following a June 17, 2002 hearing before the magistrate judge, was changed to adoption or guardianship by a relative. In July of 2002, in accordance with this goal, D.B. was conditionally released to D.C. and J.W.C., her paternal grandparents, who live in Willingsboro, New Jersey. S.B. was granted supervised visitation with her daughter every other weekend;[1] D.B.'s maternal grandmother, M.D., was granted unsupervised visitation. On September 29, 2003, the C.'s filed a motion for guardianship, seeking permanent guardianship of D.B. pursuant to D.C.Code § 16–2381 et seq. (2001). A guardianship pre-trial hearing was held on January 14, 2004. After reviewing the psychological report of S.B. prepared by a court-appointed psychiatrist, and observing that "the mother's behavior is ... out of control," the magistrate judge limited S.B.'s visitation with

---

1. S.B.'s visits were to be supervised by the paternal grandparents, the C.'s.

D.B. to one supervised telephone call per week. The magistrate judge also denied S.B.'s "oral motion to change [D.B.'s] placement."

On March 25, 2004, the magistrate judge convened a hearing on the C.'s motion for guardianship. The appellees presented the testimony of Kelly Calaway, the CFSA supervisor assigned to D.B.'s case, and that of the potential guardians, D.C. and J.W.C. Dr. Galler, a court-appointed psychiatrist, testified in regards to S.B.'s ability to safely visit with her daughter.

Ms. Calaway opined that it was in D.B.'s best interests for the C.'s to be granted guardianship. She observed that in the nearly two years that D.B. had lived with the C.'s in New Jersey, S.B. had only visited her on two occasions, and that both visits occurred in Washington, D.C., when the C.'s drove S.B. to see her mother. S.B. had never traveled to New Jersey, even though M.D., D.B.'s maternal grandmother, had traveled from Washington, D.C. to New Jersey four times. Ms. Calaway did not believe "that distance was a factor" in S.B.'s failure to visit her daughter; rather, she believed that the "relationship between S.[B.] and the C.'s" may have interfered with "setting up visitation." Ms. Calaway also observed that in the nine weeks preceding the guardianship hearing, S.B. missed three phone calls with D.B.

D.C. testified that she has a very strong bond with D.B., that D.B. views her as her mother, that she is committed to loving D.B. as her own child, and that it is D.B.'s desire to remain in New Jersey. D.C. observed that D.B. has changed for the better since moving to New Jersey. When D.B. first moved to New Jersey, "[s]he was out of control." "She would throw tantrums," and "[i]f she was asked to do something, she would huff and puff, stomp up the steps, [and be] very disruptive." But now, "[s]he's in control." "She stops and she tries to think before she opens her mouth, before she do[es] something that she knows she['s] not supposed to do." D.C. also observed that D.B. is very close with D.C.'s daughter, I.C., and that "[t]hey shop, ... bike ride.... play soccer .... [and] bond as sisters."

In regards to visitation, D.C. testified that she does not "want to interrupt the relationship between D. and her parents." She believed that D.B. "should have a good relationship with her mother and with her father," and that she "would like to see the visitations continue between [the two]" because this "will help D.[B.] to develop a more emotional attachment to her mother." D.C. stated that she supports "regular phone contact, [and] supervised visits between D. and her mom." In the nearly two years that D.B. lived in New Jersey, she had only missed one scheduled visitation in Washington, D.C., due to an "emergency." She had, however, traveled to Washington "four times" so that D.B. could visit with her mother. Finally, D.C. acknowledged that D.B.'s visits with her mother were not always positive, and that S.B. had "upset" D.B. on several occasions.[2]

Dr. Galler diagnosed S.B. with a "borderline personality disorder." He found that S.B. "has almost no insight into herself [or] ...[her] problems," and that she has "almost no[ ] capacity to empathize and understand the workings of other people's minds." He explained that "[s]he's just unable to comply with either common sense or the social worker, as well as the grandparents who are currently taking

---

**2.** J.W.C. testified that he is very close to D.B., and that they "go shopping," "bike ride," "play basketball," and play "soccer in the backyard." J.W.C. stated that he is committed to raising D.B. until she is an adult.

care of her," and that "[s]he cannot control her angry outbursts ... [or] her hurtful comments." In regards to visitation, Dr. Galler recommended that if S.B. could act "appropriately" with her daughter, that she be granted "supervised visits at least 4 times a year." He also concluded that supervised phone visitation might also be granted if she acted appropriately. Dr. Galler stressed his belief that without proper treatment and medication, it was unlikely that S.B. was capable of acting appropriately around her daughter.

At the conclusion of the guardianship hearing, the magistrate judge awarded guardianship of D.B. to the C.'s. The magistrate judge found that the C.'s had established by "clear an[d] convincing [evidence] ... that guardianship should be granted," noting that the C.'s have a "strong bond" with D.B., while the "interaction between [D.B.] and her mother ... is horrendous." The judge recognized that D.B. had expressed a desire to remain with the C.'s. The judge also found that "[a]ll of [D.B.'s] needs are being cared for [by the C.'s]," that there was "a lot of love and affection in the [C.'s] home," and that D.B. was "flourishing" in New Jersey. By contrast, the magistrate judge determined that S.B.'s "inappropriate behavior" "raise[d] serious concern[s]" and was "not healthy for the child."

In regards to what she considered to be the "crucial issue," that of visitation, the magistrate judge concluded that S.B. should have four supervised visits with her daughter annually, and that the C.'s were responsible for transporting D.B. to Washington D.C. three times per year. In reaching this decision, the magistrate judge noted that S.B. had never visited her daughter in New Jersey, even though S.B.'s mother had traveled there on four separate occasions. The magistrate judge also concluded that "[v]isitation [was to be] at the discretion of the caretakers," and that the C.'s could "suspend visitation as soon as [S.B.'s] behavior [was] inappropriate."

On June 9, 2004, the magistrate judge issued a written order of her findings of fact and conclusions of law. On the issue of visitation, the magistrate judge concluded:

> [V]isitation and contact between [S.B.] and the child are subject to the following conditions: ... 1) at the discretion of and to be supervised by the [C.'s]; 2) conditioned on [S.B.] being in weekly therapy and receiving a medication assessment by a psychiatrist and to follow the medication recommendations; 3) to be suspended by the [C.'s] if [S.B.'s] behavior during a visit is inappropriate; 4) to occur in Washington, D.C. at least three (3) times per year, it is the [C.'s] obligation to bring [D.B.] to Washington, D.C. for these visits and [S.B.'s] obligation to keep the [C.'s] abreast of her telephone number and address. The visits are only if requested by the mother. [S.B.] may arrange with the [C.'s] to visit [D.B.] in New Jersey as appropriate. [S.B.] may have some telephone access to [D.B.] during reasonable hours. The [C.'s] may supervise these telephone calls to monitor the appropriateness of the conversation.

On June 29, 2004—twenty days after the order was entered—S.B. filed a motion for review of the magistrate judge's order in the Superior Court. Recognizing that the motion might be untimely, S.B. asserted that the time for filing her motion should be extended by Super. Ct. Civ. R. 6(e),[3]

---

3. Super. Ct. Civ. R. 6(e) (2001) provides:

*Additional time after service by mail.* Whenever a party has the right or is re-

which provides that "3 days shall be added to the prescribed period" when "notice ... is served upon the party by mail." [4] On July 13, 2004, the Superior Court denied S.B.'s motion for review as untimely. It observed that "[p]ursuant to Family Court Rules D(c) and (e), a motion for review of a magistrate judge's order must be filed within ten days of the entry of the judgement or order." [5] Even "assuming that the motion was timely filed," the Superior Court concluded that the magistrate judge's "Findings of Fact and Conclusions of Law ... are supported by the record."

## ANALYSIS

S.B. contends that it was an abuse of discretion for the magistrate judge to award the C.'s permanent guardianship because it will effectively terminate her "visitation rights" with D.B. She claims that the magistrate judge's decision to place D.B. more than 150 miles from Washington, D.C., "with a permanent guardian who has [had a] bad relationship with [S.B.]," "is tantamount to the termination of [her] visitation rights." S.B. also contends that the conditions imposed on her right to visit D.B., "such as the weekly therapy and medical assessment by a psychiatrist," were not "based upon a firm factual foundation." She asks that the guardianship order "be declared illegal," and for "a more reasonable placement of her child."

### *Applicability of Super. Ct. Civ. R. 6(e).*

Before reaching the merits of S.B.'s appeal, we must decide whether her motion

for review of the magistrate judge's order, which was filed in the Superior Court on June 29, 2004, was timely. The government maintains that it was not; it argues that under Rule D (e) of the Superior Court's General Rules of the Family Division, S.B. had ten days from the date the order was entered in which to file a motion of review in the Superior Court. Given that S.B. did not file her motion within ten days as prescribed by Rule D(e), and that a magistrate judge's order is not an appealable order, the government claims that S.B. has waived her right to appeal. It also rejects S.B.'s contention that Super. Ct. Civ. R. 6(e) may be used to extend the time in which a motion for review may be filed in the Superior Court.

While a panel of this Court has not had the opportunity to consider whether Rule 6(e) is applicable to Super. Ct. Gen. Fam. R. D, we have held that the rule applies similar circumstances. For example, in *Wallace v. Warehouse Employees Union # 730*, 482 A.2d 801, 807 (D.C.1984), we concluded that Rule 6(e) was applicable to Rule 59(e) motions for reconsideration, even though "the literal language of Rule 6(e) cause[d] us to pause, since it refers to 'service' rather than 'entry.'" Nevertheless, we held "that when a judgment is rendered outside the presence of the parties or counsel and, therefore, notice is mailed pursuant to Rule 77(d), three additional days are added to the period of time prescribed in Rule 59(e), pursuant to Rule 6(e)." *Id.* at 806. Our reasoning for ap-

---

quired to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party and the notice or paper is served upon the party by mail, 3 days shall be added to the prescribed period.

4. S.B. also asked the Superior Court to review her motion "in its discretion." S.B. argued that her counsel was in California for

a week "attending his daughter's High School graduation," and that there was a "communication problem" when "[her] telephone number was changed."

5. The Superior Court also concluded that S.B. had not established "excusable neglect" for her failure to file the motion in ten days.

plying Rule 6(e) in that case, that "[i]t would not be reasonable to require that when a case is taken under advisement the parties must on every day thereafter check the records of court to find if action ha[d] been taken, in order that they may have the full four days contemplated by the rules," *see id.* at 806 (quoting *United Retail Cleaners & Tailors Ass'n of D.C. v. Denahan,* 44 A.2d 69, 70 (D.C.1945)), is equally applicable in this case.

Similarly, in *Denahan, supra,* the Court was asked to "answer ... the question ... whether Rule 6(e) applies to motions for new trials" made pursuant to Rule 52(a). 44 A.2d at 69. In finding Rule 6(e) applicable to Rule 52(a), we noted that it would be incongruous for the length of time a litigant had to move for a new trial to vary depending on whether the trial court's judgment was "made in open court" or "sent by mail." *Id.* at 70. We reasoned:

> It seems evident to us that the rules of the trial court intend that a party shall have four days after verdict or finding in which to decide whether to file a motion for new trial .... If appellant's position is correct, then in this case and similar cases the period for filing the motion for new trial would be reduced to three days; and we do not think that the rules intended that where the finding is made in open court the parties shall have four days, and where decision is reserved and notice is sent by mail the parties shall have only three days for filing their motion. There is no basis in reason for such discrimination.

*Denahan,* 44 A.2d at 70. We therefore concluded that "a reading of the rules as a whole requires that when finding is made out of the presence of counsel or parties, notice of such action shall be given by mail, and that in such a situation the time for filing a motion for new trial is by Rule 6(e)

enlarged by one day." *Id.* at 70. *See also Faggins v. Fischer,* 853 A.2d 132, 136 (D.C.2004) (noting that since the Court's decision in *United Retail Cleaners & Tailors Ass'n of D.C. v. Denahan,* Rule 6(e) applies "where the Superior Court clerk is required by Rule 77(d) to serve a notice of the entry of a judgment by mail upon parties not in default").

██ The same reasoning found in *Wallace* and *Denahan* which permitted the Court to apply Rule 6(e) to both Rule 59(e) and Rule 52(a), respectively, is equally persuasive here. When a magistrate judge makes "finding[s] ... out of the presence of counsel or parties," *Denahan, supra,* and "the Superior Court clerk is required by Rule 77(d) to serve a notice of the entry of [that] judgment by mail," *Faggins, supra,* we believe that "three additional days [should be] added to the period of time prescribed [by Rule D(e)]," *see Wallace,* 482 A.2d at 806. "We therefore hold that Rule 6(e) applies to [Rule D(e)] motions, and that [S.B.] had an additional three days within which to file [her] motion [in the Superior Court]." *Wallace,* 482 A.2d at 808.

██ We also note that in *Faggins, supra,* the Court held that the additional three-day time period for filing a motion contained in Rule 6(e) is calculated separately from the ten-day period found in Rule 59(e). 853 A.2d at 137–38. Applying *Faggins* here, we hold that "the three-day mailing extension in Rule 6(e) refers ... to business days," *id.* at 137, not calendar days, and does "not begin to run until" Rule D(e)'s ten-day time period has expired, *see Singer v. Singer,* 583 A.2d 689, 690 (D.C.1990). "By separating the time into two separate periods," the three-day period of Rule 6(e) "invoke[s] the provision of Rule 6(a) excluding Saturdays, Sundays,

and legal holidays." [6] *Faggins*, 853 A.2d at 138 (citation and internal quotation marks omitted).

In this case, the magistrate judge issued her written findings of fact and conclusions of law, granting permanent guardianship to the C.'s, on June 9, 2004. Pursuant to Super. Ct. Gen. Fam. R. D (e)(1),[7] S.B. had "10 days after the entry of the order of judgment" in which to file her motion for review in the Superior Court.[8] Excluding intervening Saturdays, Sundays, and holidays, *see* Super. Ct. Civ. R. 6(a), S.B. had until June 24, 2004, to file her motion.[9] This would make her June 29, 2004 motion untimely. However, because we have concluded that Rule 6(e) is applicable to Rule D(e) motions for review, S.B. had "an additional three days within which to file [her] motion." *Wallace, supra,* 482 A.2d at 808. Thus, excluding both the June 11th Day of Mourning, which counts as a holiday, and a single intervening weekend, which fell on June 26 and 27, 2004, S.B. actually had until June 29, 2004, to file her motion. Her motion, filed on that exact day, was therefore timely.

### The Permanent Guardianship Order and Visitation

Having concluded that S.B.'s motion was timely filed, we now consider her claim that the magistrate judge's guardianship order violated her visitation rights by, first, placing D.B. in a location that is inaccessible to her, second, giving the C.'s the discretion to cease visitation if she acts inappropriately, and third, requiring her to enter therapy and undergo a medication assessment as a condition for continued visitation.

 "The proper disposition of a neglected child, including the question whether a non-custodial parent should be granted visitation rights, is committed to the sound discretion of the trial court; the

**6.** Super. Ct. Civ. R. 6(a) (2001) provides, in relevant part:

> When the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation.

**7.** Super. Ct. Gen. Fam. R. D(e)(1) (2004 Suppl.) provides:

> *Review of hearing commissioner's order or judgment.* (1) Upon motion. With respect to proceedings and hearings under paragraphs (b) and (c) of this Rule, a review of the hearing commissioner's order or judgment, in whole or in part, shall be made by a judge designated by the Chief Judge to act on all motions for review under this Rule upon motion of a party. Such motion shall be filed and served on all parties not later than 30 days after entry of the order or judgment with respect to a motion made pursuant to paragraph (b) of this rule and 10 days after the entry of the order of judgment with respect to a motion made pursuant to paragraph (c) of this rule. The motion for review shall designate the order, judgment, or part thereof, for which review is being sought, shall specify the grounds for the objection to the hearing commissioner's order, judgment, or part thereof, and shall include a written summary of any evidence presented before the hearing commissioner relating to the grounds for the objection. Within 10 days after being served with said motion, a party may file and serve a response, which shall describe any proceedings before the hearing commissioner which conflict with or expand upon the summary filed by the moving party. The judge designated by the Chief Judge shall review those portions of the hearing commissioner's order or judgment to which objection is made, and may affirm, reverse, modify, or remand, in whole or in part, the hearing commissioner's order or judgment and enter an appropriate order of judgment.

**8.** *See Wallace,* 482 A.2d at 806 n. 14 ("Judgment is entered when set forth on a separate document and notation is entered on the docket.") (citing Super. Ct. Civ. R. 58).

**9.** A day of mourning for former President Ronald Reagan was observed on Friday, June 11, 2004.

exercise of that discretion is reviewable only for abuse." [10] *In re Ko. W.*, 774 A.2d 296, 303 (D.C.2001) (citing *In re D.M.*, 771 A.2d 360, 370 (D.C.2001)) (other citations omitted). "Judicial discretion must, however, be founded upon correct legal principles, and a trial court abuses its discretion when it rests its conclusions on incorrect legal standards." *In re J.D.C.*, 594 A.2d 70, 75 (D.C.1991) (citations omitted). "An informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation." *Johnson v. United States*, 398 A.2d 354, 364 (D.C.1979). "Just as a trial court's action is an abuse of discretion if no valid reason is given or can be discerned for it, so also it is an abuse if the stated reasons do not rest upon a specific factual predicate." *Id.* (citing *Monroe v. United States*, 389 A.2d 811, 821 (D.C.1978)) (other citation omitted).

■ We are not persuaded that the trial court abused its discretion in placing specific conditions on S.B.'s visitation.[11] First, there was ample evidence for the magistrate judge to conclude that D.B. should live with the C.'s, her paternal grandparents, in New Jersey. The testimony demonstrated that the C.'s have provided D.B. with a loving and stable home for two years; they take her to school, doctor's appointments and soccer games; they buy her presents and supply her day-to-day needs; and that, in general, she is "flourishing" in New Jersey. By contrast, S.B. presented absolutely no evidence that she is unable to travel to New Jersey or that she even wants to visit with D.B. more than three times per year. Moreover, S.B. failed to explain why she never accompanied her mother, M.D., on any of her four trips from Washington, D.C., to New Jersey. Even if we were to assume, *arguendo*, that S.B. is unable to travel to New Jersey, we would note that the guardianship order requires the C.'s to take D.B. to see her mother in the District of Columbia at least three times per year.[12] This requirement is consistent with Dr. Galler's recommendation that S.B. be limited to four supervised visits with D.B. per year.

■ Second, there is no evidence supporting S.B.'s contention that the C.'s will misuse their discretion to improperly prevent S.B. from visiting her daughter. D.C. testified that she does not "want to inter-

---

**10.** This is the first time that this Court has had the opportunity to review a permanent guardianship order issued pursuant to D.C.Code § 16–2381 *et. seq.* (2004 Suppl.), the District's newly enacted permanent guardianship statute. However, because that part of the statute relevant to the issue of visitation, § 16–2389(c), gives the trial court discretion to limit visitation between the biological parent and child, we review the trial court's order only for an abuse of that discretion.

**11.** D.C.Code § 16–2389 (2004 Suppl.) specifically lists those rights which S.B. did not lose as a result of the guardianship order. Section (c) provides:

Entry of a guardianship order does not terminate the parent and child relationship, including:

(1) The right of the child to inherit from his or her parents;
(2) The parents' right to visit or contact the child (except as limited by the court);
(3) The parents' right to consent to the child's adoption;
(4) The parents' right to determine the child's religious affiliation; and
(5) The parents' responsibility to provide financial, medical, and other support for the child.

However, as is plain from the language of § 16–2389(c)(2), the magistrate judge was free to limit S.B.'s right to visit her daughter if it was in her best interests.

**12.** In the nearly two years that D.B. lived in New Jersey, D.C. had only missed one scheduled visitation due to an "emergency." D.C. had, however, brought D.B. to see her mother "four times."

rupt the relationship between D.[B.] and her parents," and that she believed that D.B. "should have a good relationship with her mother and with her father." D.C. explained that she "would like to see the visitations continue between [S.B. and D.B.]" because this "will help D.[B.] to develop a more emotional attachment to her mother." Moreover, while Ms. Calaway, the CFSA supervisor, testified that the "relationship between S.[B.] and the C.'s" may have interfered with "setting up visitation" in some instances, there is no evidence showing that the C.'s were responsible, or that their relationship with S.B. will necessarily foreclose future visitations.

■ Third, there was sufficient evidence for the magistrate judge to condition S.B.'s visitation with D.B. on her willingness to enter weekly therapy and undergo a medication assessment. Dr. Galler diagnosed S.B. with "borderline personality disorder," and testified that she "has almost no insight into herself and to [her] problems," that she "has no, very little or almost no, capacity to empathize and understand the workings of other people's minds even," and that "[s]he cannot control her angry outbursts ... [or] her hurtful comments." Importantly for the magistrate judge's consideration, S.B.'s inability to control her anger or her hurtful comments appears to extend to her relationship with her daughter. For example, D.C. testified that during one telephone visit, S.B. actually "used profanity on the phone," which "upset D.[B.] terribly to the point that D.[B.] hung the phone up." Dr. Galler concluded that without proper treatment and medication, it was "unlikely" that S.B. was capable of acting appropriately around her daughter. Given the strength of Dr. Galler's testimony, and that S.B. offered no evidence to contradict his expert opinion or demonstrate that she was capable of behaving appropriately when visiting with her daughter, we conclude that it was not an abuse of discretion for the magistrate judge to require S.B. to attend weekly therapy and undergo medication assessment. We cannot say that the conditions imposed by the magistrate judge "do not rest upon a specific factual predicate." *Johnson, supra,* 398 A.2d at 364.

For the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*