**In re DE.S., E.B., Appellant.**

**No. 04–FS–1214.**

District of Columbia Court of Appeals.

Argued Jan. 5, 2006.

Decided March 16, 2006.

---

Bashiru A. Jimoh, Philadelphia, PA, appointed by the court, for appellant E.B.

Stacy L. Anderson, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellee District of Columbia.

Louis C. Whitsett, appointed by the court, filed a statement in lieu of brief for appellee D.B.

Before REID and KRAMER, Associate Judges, and KERN, Senior Judge.

KERN, Senior Judge:

This appeal presents for our determination whether the trial court committed reversible error by affirming an order entered by its magistrate judge after an evidentiary hearing that a minor child, De. S., was a "neglected child" within the meaning of D.C.Code § 16–2301(9)(A)(ii) (2004 Supp.) because he was "regularly exposed to illegal drug-related activity in the home."

## I.

The record reflects that at a hearing on a so-called neglect petition [1] the magistrate

---

1. The petition was filed pursuant to D.C.Code § 16–2305 (2001) and alleged that De.S. is a neglected child under D.C.Code §§ 16–2301(9)(A)(ii), (iii), (x) (2004 Supp.) which defines a "neglected child," amongst other things, as one:

(ii) who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or custodian;

(iii) whose parent, guardian, or custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity; [or]

judge heard testimony that the police had received complaints of drug sales near the house where De.S. and his father lived, as well as various other members of his family.[2] Accordingly, the police initiated an undercover investigation and operation in this area. Thus, an undercover officer asked a passer-by near the home of De.S. where drugs could be purchased and was directed to the very house where De.S. was living. Thereafter, the undercover officer obtained entry into this house and observed the sale of what appeared to be crack cocaine in a ziplock bag which was removed from a couch in the living room. As soon as the purchaser left the house other undercover officers stopped him and recovered the bag from his person. The contents were "field-tested" and the results were "positive" for crack cocaine.

Shortly thereafter, other members of the police undercover team stopped a woman who had just left the house of De.S. and recovered from her a package similar to the one they had recovered from the first person arrested. This package also contained cocaine. The police then ceased their undercover operation and applied for and received a warrant to search the house in which De.S. was living with his father because they suspected this house was the source of the drug activity which had been complained about in the neighborhood.

The undercover buys had taken place on February 21, and the execution of the search warrant occurred on March 2. This search of the house where De.S. lived revealed a gun and ammunition in an upstairs bedroom, and two crack pipes, as well as empty ziplock bags, downstairs near the couch where the undercover officer had earlier observed similar bags

stashed. The great-aunt of De.S. admitted to the officers that she had been selling drugs from the house, but that she had been tipped off by the woman whom they had arrested in their earlier "sting" operation. After the police arrested the great-aunt, they found heroin on her person.

The magistrate judge at the conclusion of the hearing stated:

> We all know what our typical neglect cases involve: dirty houses, absent parents, very seriously unsafe physical conditions in the home like ... no screens or windows, and floorboards falling in, and ... things that can clearly cause physical harm.... *This case doesn't present any of that.* (Emphasis added.)

The judge went on to note:

> This case presents an extended loving family who is very attached to ... [De.S.] [who] lost his mom, but ... has a loving father and a whole host of loving extended family members.... This is a child who is clean, healthy, fed, clothed, attending school.... He is receiving proper healthcare for his cerebral palsy. I think [De.S.] was ... nicely cared for in many, many ways that many of the kids in our neglect system are not well cared for.

However, the judge explained:

> [H]ere's the problem. A parent and someone acting *in loco parentis* has an obligation to do more than just ... [provide] clothing, food, healthcare, school.... A parent also ... needs to make sure that a child is in a safe environment.

The judge went on to conclude:

> I think we have a classic case of a very nice home with loving people, but some

---

(x) who is regularly exposed to illegal drug-related activity in the home.

**2.** The house was owned by the great-grandmother of De.S. and occupied also by various aunts and uncles.

very ... unsafe activity, and unsafe items in the home.

Drugs have been found in the home, drugs were found on the person of one of the caretakers .... Drug paraphernalia was found near the couch in the living room .... The gun ... it's absolutely clear that handguns are illegal in the District of Columbia.

The gun was not found in a locked container ... and [De.S.] had access to the entire home.

Finally, the judge concluded:

I do find ... that there was ongoing drug activity in this child's home. There was the sale ....There was the paraphernalia that was found in the home. There [were] the drugs on the person of one of the people who was [acting] *in loco parentis* ... [and] the fact that there was heroin and cocaine in this home .... And on top of that a gun and ammunition ... [so] that while I think the family is very well meaning ... [b]ut he's also exposed to drugs, and that is dangerous.

[G]iven the ongoing drug activity in the home and the presence of illegal drug paraphernalia, illegal drugs, and a gun and ammunition ... [De.S.] is neglected ....The best place for him is with his family back in his home. But I will ... need to know that the home is safe ... And so, someone needs to show me that the child can be put into a safe environment. And safe means ... no drugs, no drug using, no drug selling, no guns, no ammunition.

## II.

■ Appellant, the father of De.S., first argues that the magistrate judge's "conclusions ... are based on the false premise that since a gun was recovered in the house and there was an alleged attempted drug buy, that violent activity exists in the home." Appellant further argues that the events to which the trial court referred "fall far short of establishing 'regularity' for the purpose of removing a child from his home.... [T]he government presented no evidence of drug activity occurring in the child's home between these two [events].... The drug paraphernalia taken from the home ... consisted of only two empty baggies and two crack pipes, none of which was in plain view of De.S. .... As for the gun ... [n]o evidence was presented whether the gun was found in a locked safe ... or on the kitchen table in plain view .... There is no evidence that De.S. saw the gun or knew there was a gun in the house." [3]

■ In a challenge to the sufficiency of the evidence, this court views the evidence in the light most favorable to the government and draws every reasonable inference in the government's favor. *In re E.H.*, 718 A.2d 162, 168–69 (D.C.1998). This court is constrained to uphold a trial

---

**3.** In a related argument, appellant complains that the magistrate judge improperly permitted several witnesses to testify as rebuttal witnesses. Since the primary object of this proceeding is to determine the best interests of the child, we reject such a crabbed application of the rules of evidence. We have recognized previously the duty of the judicial officer to obtain a wide array of information in order to assure that the best interests of the child are served. *See In re M.D.*, 758 A.2d 27, 33–34 (D.C.2000) (holding that the trial court in a neglect proceeding has the "paramount obligation ... to protect the best interests of the child ... [and] ought not to be passive in the face of what it recognizes is a deficient presentation of evidence. In such a case the court may and should take affirmative steps to ensure that it has enough evidence before it to make an informed decision.") (internal quotations and citations omitted). Accordingly, we reject appellant's argument that this procedural deficiency requires reversal.

court's finding of neglect unless the trial court's judgment is plainly wrong or without evidence to support it. *Id.* at 168; D.C.Code § 17–305(a) (2001). Moreover, this court cannot reexamine the credibility of witnesses where the trial court has had the opportunity to view and assess their demeanor. *Id.* at 169. Although we have yet to address the proof requirements of D.C.Code § 16–2301(9)(A)(x), we recognize the application of this statute is a fact-specific process, and the trial court is in a superior position to evaluate all of the testimony and weigh all other evidence in making its determination.

Appellant fails to persuade us that there was insufficient evidence to support the magistrate judge's ultimate findings and conclusion that De.S. was a neglected child because the record reflects quite clearly that he was living in his home where illegal drugs were being regularly sold, that there was a weapon and ammunition, unsecured, in his home, and that some of his family in his home were directly involved in drug-selling and other family members tacitly approved such drug-selling. We note that D.C.Code § 16–2301(9)(A)(x), effective October 1, 2003, provides, in part: "The term 'neglected child' means a child ... who is regularly exposed to illegal drug-related activity in the home." We further note that D.C.Code § 16–2301(37) states, in pertinent part, "[t]he term 'drug-related activity' means the use, sale, distribution, or manufacture of a drug or drug paraphernalia without a legally valid license or medical prescription." Thus, the record demonstrates that De.S. was a neglected child because he was living in a home where drugs were being sold.

Nor are we persuaded upon this record by appellant's assertion, "These two alleged drug-related activities did not show ... that it was occurring on a *regular* basis." (Emphasis added.) Contrary to appellant's assertion, the record reflects that: (1) passers-by in the neighborhood knew drug activities were taking place in the child's home; (2) one of the relatives living in the home of De.S. admitted that she had been selling drugs from the home but then had ceased such activity and removed the drugs from the home upon being tipped off that the police knew about such drug activity; and (3) an unsecured weapon and ammunition were still in the home where De.S. lived when the police executed a search warrant as part of their successful "sting" operation.

We note the concern of the District of Columbia Council regarding children who are "regularly exposed to illegal drug-related activity in the home." Thus, D.C.Code § 4–1301.06a requires that when the Child and Family Services Agency (CFSA) receives a report that a child is being regularly exposed to illegal drug-related activity in the home, CFSA *must* investigate in order to determine if the circumstances warrant either a removal of such child from the home or the provision of social services within the home.[4]

Moreover, the Council in D.C.Code § 4–1301.06a (b) has provided that the investigation shall include: (1) determining

---

4. This statute provides in pertinent part:

(a) Upon receipt of a report that a child ... is regularly exposed to illegal drug-related activity in the home, the Agency shall:

(1) Commence an initial investigation in accordance with §§ 4–1301.04(b) and 4–1301.06;

(2) Determine whether the child should be removed temporarily from the home environment or can be protected in the home environment in accordance with § 4–1301.07(a); and

(3) Commence a social investigation and provide social services in accordance with § 4–1301.09(b), if the initial investigation results in a substantiated report.

D.C.Code §§ 4–1301.06a (a)(1)-(3) (2004 Supp.).

whether there is reasonable evidence that any member of the child's home uses drugs illegally; (2) whether the child is regularly exposed to drug use in the home; (3) whether there is reasonable evidence the sale or distribution of illegal drugs or illegal drug paraphernalia is occurring in the home; and (4) finally, whether there is reasonable evidence that the drug-related activity either has contributed to *or is likely to contribute* to violent conduct within a child's home.

We are convinced upon this record that the magistrate judge, after carefully and conscientiously weighing the testimony and other evidence and considering the applicable statutory factors, properly concluded that De.S. was being "regularly exposed to illegal drug-related activity" which required his removal from his home. Thus, we affirm the trial court's decision which upheld the magistrate judge's order concluding De.S. was a neglected child.[5]

Accordingly, for the foregoing reasons, the judgment is

*Affirmed.*

---

**5.** In so doing, we reject appellant's argument that the magistrate judge erred when she determined there was sufficient evidence to indicate that the great-aunt was acting *in loco parentis* toward De.S. given evidence that the great-aunt did not assume "all" of the responsibilities of a natural parent. *In re S.L.E.,* 677 A.2d 514, 522 n. 14 (D.C.1996) instructs that when a caretaker lives in the same home as the minor child, supervises that child every day after school, chaperones the child on outings, and occasionally buys food and clothing for the child, that caretaker was acting *in loco parentis.* Here, the record shows that the great-aunt ensured that De.S. was up and ready for school on time. She picked him up from the bus stop after school, monitored his studies, oftentimes prepared his meals and made certain that he went to bed on time. Moreover, she purchased and laundered clothing for him. Given this court's decision in *In re S.L.E.,* we are not persuaded that the magistrate judge erred when she determined the great-aunt was acting *in loco parentis.*