**In re M.F., J.F., Appellant.**

No. 08–FS–733.

District of Columbia Court of Appeals.

Submitted March 23, 2010.

Decided Sept. 27, 2012.

Relinda Louisy, Washington, DC, appointed by the court, was on the brief for appellant.

Jon A. Hoppe, appointed by the court, was on the brief for appellee M.S.

Sharon Taylor Smith, guardian ad litem, filed a statement in lieu of brief for appellee M.F., in support of the brief of M.S.

Peter J. Nickles, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Attorney General, and Alice V. Stevens, Assistant Attorney General, were on the brief for appellee District of Columbia.

Before PRYOR, TERRY, and FARRELL, Senior Judges.

TERRY, Senior Judge:

The Child and Family Services Agency ("CFSA") removed eleven-year-old M.F. from the custody of her father, appellant J.F., after a phone call to the CFSA child abuse hotline and a subsequent visit by authorities to M.F.'s home. Two days later the District of Columbia filed a petition in the Superior Court alleging that M.F. was a neglected child. After an evidentiary hearing, Magistrate Judge Tara Fentress found that M.F. was abused and neglected under D.C.Code § 16–2301(9)(A)(i), (ii), (iii), and (x) (2009 Repl.). Upon review, Associate Judge Odessa Vincent affirmed the decision of the Magistrate Judge. In this appeal from Judge Vincent's final order, J.F. argues (1) that the evidence was insufficient to support the adjudications of neglect; (2) that the court erred by failing to compel the District of Columbia to provide J.F. with a copy of a taped interview with M.F.; and (3) that the court erred when it denied visitation rights to J.F. We find no error and affirm the judgment in all respects.

I

At the neglect hearing before the Magistrate Judge, five witnesses testified for the District of Columbia: Dr. Allison Jackson, a pediatric physician who conducted a physical examination of M.F.; Dr. Jennifer Carter, a psychologist who performed an evaluation of M.F. pursuant to a court order; Kamilah Oliphant, a CFSA social worker who visited M.F. at her father's apartment in response to the child abuse hotline call; Tracy Wright, the principal of M.F.'s elementary school; and M.F.'s biological mother, M.S.[1] J.F., the father, did not testify and did not call witnesses on his behalf. Before any testimony began, J.F. stipulated to the introduction of drug test results showing that he consistently tested positive for PCP from April to June 2007.[2]

---

1. Because the testimony of M.S. is not relevant to the issues presented on appeal, we will not summarize it in this opinion.

2. The District of Columbia originally listed M.F. herself as a witness in the joint pretrial statement. At a pretrial hearing, however, counsel for the District requested a continuance to prepare M.F. to testify because a psychological evaluation "indicated that the child is quite stressed" about testifying. The Magistrate Judge stated that she did not believe it was in M.F.'s best interest to testify and denied the District's request for a continuance. J.F. agreed that M.F. should not testi-

Ms. Oliphant, the CFSA social worker, testified that she visited J.F.'s home with two police officers at 3:00 a.m. on March 15, 2007, after the CFSA child abuse hotline had received a telephone call alleging that J.F. was abusing M.F. She saw that the apartment had no furniture except for a box spring in J.F.'s bedroom, and she noted that music was playing loudly. M.F., who was awake when she arrived, told Ms. Oliphant that she was returning to her room from her father's bedroom because he had awakened her to come and sleep with him. M.F. said that this was a regular occurrence and would cause her to be tardy or absent from school. Ms. Oliphant observed that M.F. was using a hall closet as her bedroom, with a sheet on the floor for sleeping and shelves above her head where M.F. stored her belongings. When she interviewed M.F. alone, M.F. told her that J.F. had slapped her and had touched her on her breast and vaginal area in the past. M.F. also told Ms. Oliphant that she had witnessed her father using drugs, that she could smell the drugs on him, and that she had awakened with J.F. on top of her without any clothes on, smelling of drugs. M.F. said that the drugs she saw were "the thing that is put into dead people," and alternately called it "water" and "boat." Ms. Oliphant then interviewed J.F., who denied the abuse allegations. Nevertheless, as a result of the visit, M.F. was removed from J.F.'s home.[3]

Dr. Allison Jackson, a pediatrician, examined M.F. after CFSA personnel brought her in for an evaluation in April of 2007. Dr. Jackson testified that M.F. had a "very sad appearance" during the medical examination, and that she made minimal eye contact and had "no inflection in her voice, no animation."[4] While Dr. Jackson was taking M.F.'s medical history, M.F. told her that her father had "touched her with his hands underneath her clothes on her private part," and that these incidents "started happening when she was six years old and that the last time was February of this year." Dr. Jackson also testified that M.F. had a "normal anogenital exam," but that this was not inconsistent with M.F.'s allegations of abuse.

Tracy Wright, the principal of M.F.'s school, testified that after M.F. was enrolled in school by her father, her attendance was poor; she would "miss a couple of days during the week. She was tardy sometimes." On one occasion M.F. missed an entire week of school because, according to J.F., he and his ex-wife were in California filming an episode of a television show called "Divorce Court," and M.F. "didn't have anyone to watch her or to bring her to school, so she stayed home." When another absence occurred, Ms. Wright testified, J.F. explained that M.F. "had to get her hair done." Finally, Ms. Wright said that after M.F. was removed from her father's home, she improved academically[5] and had fewer disciplinary

---

fy, and at the neglect hearing two weeks later, M.F. did not testify.

3. Counsel for J.F. did not initially object to Ms. Oliphant's testimony about the statements M.F. had made to her. However, the day after Ms. Oliphant testified, J.F.'s counsel moved to strike that testimony on Sixth Amendment confrontation grounds. The court denied the motion, and we find no error in that denial. See note 12, *infra*.

4. Ms. Oliphant had also testified that during their conversation M.F. had a "flat" demeanor.

5. Ms. Wright testified that M.F. was earning B's and C's when she lived with her father, but since her removal from J.F.'s home, M.F. had "a high B average." She also stated that before M.F. was enrolled in the school by her father, "she was an A–B student" in her former school.

problems: "No detention, no suspensions. So she's been doing well."

Dr. Jennifer Carter, a psychologist, conducted a psychological evaluation of M.F., pursuant to a court order, to determine whether M.F. could deal with testifying in court. Before the hearing began, counsel for J.F. made an oral motion to exclude Dr. Carter's psychological report and her testimony because both contained hearsay statements by M.F. The court denied the motion, stating, "This is the type of testimony that would definitely come in." Counsel for J.F. also noted a continuing objection to Dr. Carter's testimony during the hearing, relying on the same grounds as argued in the previous motion, but the court overruled the objection.

Dr. Carter testified that M.F. told her that she "had seen her father use illegal drugs, and that he acted differently and talked differently in her opinion when he used drugs." Dr. Carter also recounted some of M.F.'s statements that her father had abused her, and that he had "smashed [her] up against the wall" and slapped her. When M.F. said that her father had touched her, Dr. Carter asked whether she was penetrated vaginally and anally, and M.F. said, "Yes." M.F. also told the doctor that "she was fearful if she saw her father again, that he would hit her because she had told about the abuse." M.F. added that her father had threatened to kill himself if she told, and that he would go to jail and she would go to a foster home if she disclosed the abuse. Dr. Carter concluded that M.F. would be "retraumatized" if she had to testify in open court and face her abuser. She determined that M.F. should not have contact with her father, and that

if she needed to testify in court, "it should be under a closed circuit situation." When asked for a diagnosis, Dr. Carter said that M.F. was suffering from post-traumatic stress disorder, major depression, and physical and sexual abuse. At the conclusion of her testimony, the court admitted Dr. Carter's written psychological report into evidence.

A short time after the hearing was completed, the Magistrate Judge issued a detailed order containing findings of fact and conclusions of law. She ruled that the statements made to Dr. Carter and Dr. Jackson by M.F. were admissible as statements made for the purpose of a medical diagnosis. The judge found that J.F. both physically and sexually abused M.F. Citing Ms. Wright's testimony, she found that M.F.'s performance in school improved after she was removed from her father's home. The judge credited Dr. Carter's testimony and found that M.F. was fearful of her father, that she had been abused by her father, and that she had seen her father use drugs. The judge also credited Ms. Oliphant's testimony that M.F. had been abused by her father, that her father would summon her to his bed in the middle of the night, and that M.F. was depressed and despondent. "Based on the testimony of Dr. Carter, Dr. Jackson, and Ms. Oliphant, [the judge found] that [M.F.'s] statements regarding both physical and sexual abuse by her father, [J.F.], are consistent and credible."[6] The judge concluded that the District had established by a preponderance of the evidence that M.F. was a neglected child as defined in D.C.Code § 16–2301(9)(A)(i), (ii), (iii), and (x).[7]

---

6. The Magistrate Judge expressly credited M.F.'s statements, about which various witnesses had testified, throughout her order.

7. D.C.Code § 16–2301(9)(A), which was enacted in its present form in 2002, defines a "neglected child" in part as a child:

(i) who has been abandoned or abused by his or her parent, guardian, or custodian,

J.F. filed a motion for review of the Magistrate Judge's order.[8] Thereafter Judge Vincent of the Superior Court issued an order affirming the decision of the Magistrate Judge. Judge Vincent concluded that the District had established by a preponderance of the evidence that M.F. was a neglected child under D.C.Code § 16–2301(9)(A)(i), (ii), (iii), and (x). The judge stated that J.F.'s continued use of drugs, which caused M.F. to be regularly exposed to her father's illegal drug activity, as well as J.F.'s acts of striking M.F. in the face, lying on top of her, and summoning her to sleep in his bed, were "unreasonable, excessive, and abusive." J.F. now appeals from Judge Vincent's final order.

## II

J.F. argues that there was insufficient evidence to support the court's findings of neglect because the court relied on inadmissible hearsay. Since M.F. did not testify, he maintains that the out-of-court statements she made to Dr. Carter and Ms. Oliphant, which they recounted in their testimony[9] and which the court relied upon in its order, were inadmissible, and that without them the evidence was insufficient.[10]

▮ "In a challenge to the sufficiency of the evidence, this court views the evidence in the light most favorable to the government and draws every reasonable inference in the government's favor." *In re De.S.*, 894 A.2d 448, 451 (D.C.2006). We are obliged to uphold a trial court's finding of neglect unless the court's judgment is "plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (2001). In reviewing neglect findings under D.C.Code § 16–2301(9)(A), we must decide whether the District met its burden by a preponderance of the evidence. *In re E.H.*, 718 A.2d 162, 168 (D.C.1998).

The statements at issue, including M.F.'s statements about abuse at the hands of J.F., his drug use, and her fear of J.F., were hearsay because they were out-of-court statements made by M.F., and were admitted through the testimony of Dr. Carter and Ms. Oliphant for the truth of their assertions. Many of the court's findings were based on M.F.'s statements.[11] Although the court admitted

---

or whose parent, guardian, or custodian has failed to make reasonable efforts to prevent the infliction of abuse upon the child . . . .;

(ii) who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or custodian;

(iii) whose parent, guardian, or custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity; [or]

\* \* \* \* \* \*

(x) who is regularly exposed to illegal drug-related activity in the home.

8. Under Super. Ct. Gen. Fam. Rule D(e), an Associate Judge of the Superior Court, desig-

nated by the Chief Judge, may review an order or judgment of a Magistrate Judge upon motion by one of the parties. *See also* D.C.Code § 11–1732(k) (2001).

9. The court admitted the statements of M.F. through the testimony of Dr. Carter as statements supporting a medical diagnosis. It did not articulate a basis for the admission of the statements made to Ms. Oliphant.

10. Appellant does not separately argue that the admission of the hearsay through Dr. Carter's testimony was itself error requiring reversal.

11. The Magistrate Judge stated in her order that she found M.F.'s statements credible, indicating the judge's reliance on these statements as substantive evidence of her father's abuse and drug use.

M.F.'s statements through the testimony of Dr. Carter under the medical diagnosis exception to the hearsay rule, *see Galindo v. United States,* 630 A.2d 202, 210 (D.C. 1993), it is not clear that Dr. Carter's evaluation falls within the exception. *See In re C.A.S.,* 828 A.2d 184, 190–191 (D.C. 2003) (children's statements made to psychologist were inadmissible hearsay because her interview with the children was conducted at the request of the government "solely in preparation for the doctor's testimony at the hearing").

■ But we need not decide that point here. Even if the court erred in admitting the testimony under the medical diagnosis exception, any error was harmless because Dr. Carter's testimony was consistent with, and corroborated by, that of other witnesses. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (defining harmless error). In particular, hearsay statements by M.F. were also admitted through the testimony of Dr. Jackson. J.F. did not object to Dr. Jackson's testimony at trial, nor does he argue on appeal that the admission of these hearsay statements was erroneous. As for the statements made by M.F. to Ms. Oliphant, we have repeatedly and consistently held that hearsay that is admitted without objection "may be properly considered by the trier of fact and given its full probative value." *Eldridge v. United States,* 492 A.2d 879, 883 (D.C.1985) (citations omitted). Because J.F. did not object to Ms. Oliphant's testimony on hearsay grounds (see note 3, *supra* ), M.F.'s statements to her were admissible evidence, which we may consider in evaluating appellant's insufficiency claim.

Viewing the evidence, as we must, in the light most favorable to the appellees, we readily hold—even excluding Dr. Carter's arguably inadmissible testimony from our consideration—that it was sufficient to support the court's findings of neglect. The evidence showed that J.F. physically and sexually abused M.F. on a number of occasions, that M.F. was regularly exposed to illegal drug activity in her father's home, and that J.F. was unable to discharge his responsibilities to M.F. because of his drug use, leaving her without proper parental care. Ms. Oliphant testified to the fact that M.F. slept on a sheet in a closet rather than in a real bed, that J.F.'s home had no furniture except for a box spring in his own bedroom, and that M.F. was awake at 3:00 a.m. with music blaring in the home during her visit, even though it was the middle of the night. Dr. Jackson recounted statements made by M.F. describing, in detail, abuse at the hands of her father as well as his use of drugs. In addition, Ms. Wright testified that M.F.'s academic performance and school attendance had suffered while she lived with her father, but that it improved once she was out of his home. Finally, J.F. consistently tested positive for drugs over a two-month period. All of this evidence, considered as a whole, strongly supports the adjudications of neglect.[12]

### III

■ J.F. also argues that the court erred in not compelling the District to provide him with a copy of an interview of M.F. that was conducted at the Child Advocacy Center ("CAC") after her removal from his home. It appears from the record, however, that the interview tape was

---

12. J.F. also argues that his Sixth Amendment right to confront his accuser was violated because of the admission of M.F.'s out-of-court statements. This argument is without merit because the Sixth Amendment's Confrontation Clause does not apply in civil neglect proceedings. *See In re D.B.,* 947 A.2d 443, 449 n. 11 (D.C.2008).

in the possession of the United States Attorney's Office for purposes of a criminal prosecution, and that the District of Columbia Attorney General's Office did not have possession of it. The court stated that since the tape was in the possession of the United States Attorney, it did not have the power to obtain the tape for use in the neglect proceedings. We find no error in this ruling. We hold that, because the United States was not a party to this case at any time, the court did not have the authority to compel disclosure of the tape. *See, e.g., Myers v. United States*, 15 A.3d 688, 692 (D.C.2011) (government's failure to produce video recording did not breach its duty to preserve discoverable evidence because the recording was never in the government's possession).

■ More fundamentally, there was no evidence before the court concerning the content of the CAC interview. J.F. was not prejudiced by the unavailability of the tape because no testimony was presented by anyone about the statements made on the tape by M.F.[13] Although there were some references to the fact that the interview had taken place, the witnesses' testimony did not address the substance of the interview, and the court did not make any reference to it in its findings.

### IV

■ Finally, J.F. argues that the court erred by prohibiting him from any visitation with M.F. The court's visitation order was temporary, however, and allowed for the possibility of visitation after the completion of the pending criminal case against J.F. In *In re D.M.*, 771 A.2d 360 (D.C.2001), we held that an indefinite denial of visitation that had continued for more than four years was a final order for purposes of appellate review. We said that

since "the denial of visitation has continued for more than four years ... it cannot fairly be characterized as temporary." *Id.* at 366. In the instant case, by contrast, the order makes clear that the court would allow "supervised visits" under certain conditions "[a]fter conclusion of [the] criminal case...." On this record we conclude that the visitation ruling was temporary, with the court maintaining jurisdiction on the visitation issue pending the outcome of the criminal proceeding against J.F. Thus we hold that the visitation order in this case, unlike the order in *In re D.M.*, was not a final order subject to appellate review.

### V

The adjudications of neglect under D.C.Code § 16–2301(9)(A)(i), (ii), (iii), and (x) are supported by sufficient evidence. There being no other error, the judgment is

*Affirmed.*

---

13. As the District points out in its brief, M.F.'s guardian *ad litem* asked Dr. Carter whether she had reviewed the recording of the CAC interview, and she replied that she had not. Ms. Oliphant was not questioned about the CAC interview.