*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-FS-380

IN RE TA.C.; T.C., APPELLANT,

Appeal from the Superior Court
of the District of Columbia
(NEG-375-18)

(Hon. Tara J. Fentress, Magistrate Judge);
(Hon. Julie H. Becker, Trial Judge)

(Submitted March 26, 2020                    Decided September 10, 2020)

*Kwame Willingham* was on the brief for appellant T.C.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Deputy Solicitor General, and *David J. Stark*, Assistant Attorney General, were on the brief for appellee the District of Columbia.

Before GLICKMAN and MCLEESE, *Associate Judges*, and FISHER, *Senior Judge*.[*]

GLICKMAN, *Associate Judge*:    Appellant T.C. asks us to reverse the

adjudication of his son, Ta.C., as a neglected child under D.C. Code § 16-2301(9)(A)

_____

[*] Judge Fisher was an active Associate Judge of the court on the date this appeal was submitted for decision. His status changed to Senior Judge on August 23, 2020.

(2012 Repl. & 2020 Supp.). Appellant contends the trial court had insufficient evidence to support either of its alternative neglect findings, that Ta.C. was without proper parental care or control, and that Ta.C. was regularly exposed to illegal drug-related activity in the home.[1] We agree with T.C. that the proof was insufficient to support a finding of neglect on the latter ground. However, we uphold the finding that Ta.C. was without proper parental care or control. We therefore affirm the adjudication of neglect.

**I.**

Ta.C was born on February 8, 2016, to appellant and S.R. For reasons not material to this appeal, appellant took sole custody of Ta.C. in August 2017. The child remained in appellant's custody and care until he was removed from appellant's home under the following circumstances.[2]

On the morning of November 7, 2018, Metropolitan Police officers responded to a report of gunshots at an apartment located at 39 Galveston Place, S.W. They

---

[1] D.C. Code §§ 16-2301(9)(A)(ii), (x).

[2] At the time of the neglect adjudication, S.R. was under court order to stay away from Ta.C. She was notified of the neglect hearing, but she did not participate in it.

were met at the apartment by Kenneth Flood, who had been wounded but was able to tell them what happened. A second man, Eugene Johnson, was lying dead from a gunshot wound to his chest. Stepping over Mr. Johnson's body, the police found Ta.C. The child was asleep on the floor and uninjured, though he was covered with spattered blood on his face, hair, and clothing. Ta.C.'s father, appellant, was not present when the police arrived and did not appear in the next few hours before the child was taken into CFSA custody. Appellant was located later that morning.

Two days later, the District filed a petition to have Ta.C. adjudicated a neglected child within the meaning of D.C. Code §§ 16-2301(9)(A)(ii), (iii), and (x), because (1) he was "without proper parental care or control"; (2) his caretaker was "unable to discharge his or her responsibilities to and for the child because of . . . physical or mental incapacity"; and (3) he was "regularly exposed to illegal drug-related activity in the home." At the ensuing two-day fact-finding hearing before Magistrate Judge Fentress, the District called appellant himself in its case-in-chief and several other witnesses in support of these charges. Neither appellant nor any other interested party presented evidence.

Appellant testified that when Ta.C. was in his care, they lived in the one-bedroom apartment at 39 Galveston Place with Johnson and Flood. Johnson, who

held the lease on the apartment, slept in the living room with Flood, while appellant and Ta.C. shared the bedroom. Appellant testified that he regularly left Ta.C. in Johnson's sole care when he was at work or otherwise out of the home. Appellant described Johnson as a good person and a co-parent; the two were friends and had been raising Ta.C. "as partners," he stated.

On November 7, 2018, appellant testified, he left the Galveston Place apartment at approximately 3:40 a.m. to bring soap and toiletries to a female friend of his who was staying in a vacant apartment that appellant used with the permission of another friend. Appellant left Ta.C. in the care of Johnson (who was sleeping) while he went on this errand. When asked where he went that morning after making the delivery to his friend, appellant invoked his Fifth Amendment privilege against self-incrimination and declined to answer. He continued to assert his right to remain silent when asked whether there were firearms or ammunition in the Galveston Street apartment; whether he had been in possession of a gun within the last six months; whether he had possessed or sold illegal drugs within the last six months; and about Johnson's source of income. The magistrate judge drew "all permissible negative inferences" from appellant's assertions of the privilege.[3]

---

[3] *See In re D.B.*, 947 A.2d 443, 451 n.15 (D.C. 2008). Appellant stipulated that he had failed to submit to weekly court-ordered drug testing prior to the neglect

Dr. Bernadette Carroll, a CFSA investigative social worker, testified that she went to the Galveston Place apartment on the morning of November 7 in response to a police report of an unidentified child found at the scene of a homicide there. She entered the apartment at approximately 7:00 a.m., after the police had obtained a search warrant. Dr. Carroll described the apartment as a small unit with a galley kitchen that connected the living and dining area to the single bedroom. In the living and dining area she saw an overturned mattress that was covered in blood. Mr. Johnson's body lay in the kitchen area, impeding access to the bedroom. Dr. Carroll stepped over the body to enter the bedroom. There was no bed in that room; she found Ta.C. asleep on the floor on what she called a "palette of pillows and blankets." (A police officer had been guarding the child, after ascertaining that he had not been hurt, until Dr. Carroll arrived.) There was blood splattered on Ta.C.'s clothing, face, and in his hair. Dr. Carroll confirmed that Ta.C. had not been injured. His diaper was soiled and the soles of his feet were covered with an unidentified black substance, which Dr. Carroll was able to remove with some effort. She took the child into CFSA custody and was able to determine the child's identity from CFSA records.

---

hearing. The magistrate judge inferred that if appellant had complied with that order, he would have tested positive for one or more substances each week.

The police interviewed appellant later that morning. Dr. Carroll was allowed to listen in. She testified that in the interview, appellant admitted to using marijuana, stated that Johnson sold marijuana, and that there might be a rifle in the apartment.

Detective Stephanie Garner testified that in executing the warrant to search the Galveston Place apartment, she discovered a rifle on the floor in an open closet in the bedroom. The rifle was unsecured and accessible to anyone who went into the closet. Detective Garner also found two types of ammunition on the highest shelf of the closet, and one empty ammunition magazine. There was no testimony regarding whether the rifle was operable or was loaded. No drugs or drug paraphernalia, nor other evidence of drug usage or distribution, were found in the apartment.

Officer Calvin Branch testified that he was one of the police officers who responded to the shooting at Galveston Place. When he arrived at the apartment, he knocked on the door, and Mr. Flood answered. Flood had been shot in the head and was scared, but he was able to give a statement. He told police that someone had knocked at the back door and when he and Johnson went to open it, the person kicked in the door and drew a gun. A struggle followed, during which the intruder fired the shots that injured Flood and killed Johnson. Counsel for the District represented that

a suspect (not appellant) had been charged with Johnson's murder. No other evidence was presented regarding the suspect or the motive for the intrusion and the killing.

Officer Branch was one of several police officers who testified about their familiarity with appellant and their recent interactions with him in the community before and after the November shooting. Branch knew him well and frequently saw appellant during the nighttime and early morning hours at a 7-11 convenience store and a Shell gas station located on South Capitol Street S.E. When Branch encountered him there, appellant usually appeared to be under the influence of a mind-altering substance, with bloodshot eyes and "hyped, but coherent." On one occasion, which took place in June 2018, Branch found appellant at the gas station in a highly intoxicated state and out of control. When appellant saw the police, he stripped completely naked and started running towards them. Appellant was taken to the hospital following that incident. Another officer testified about a call in October 2018 concerning a person under the influence and rolling around in the street outside 32 Galveston Place. The police found appellant lying in the street and "rapping." They took him to the hospital. Ta.C. was not with his father during any of these interactions with police.

Two other officers testified to their knowledge of appellant's arrests following Ta.C.'s removal. In the month preceding the neglect hearing, appellant was arrested twice—once for selling marijuana to an undercover police officer,[4] and again when the police officer saw a pistol fall out of appellant's pants after he ran heedlessly into the street to avoid the police and was hit by a car.[5]

Finally, Kameko Johnson-Styles, a social worker assigned to Ta.C. and his siblings, testified that she had supervised four visits between appellant and his children following Ta.C.'s removal.[6] On one of the visits, appellant was required to dispose of a pocketknife before he was allowed to enter CFSA, and he appeared to be under the influence of marijuana.

Based on the foregoing evidence, Magistrate Judge Fentress concluded that the District had proved by a preponderance of the evidence that Ta.C. was a neglected child within the meaning of D.C. Code §§ 16-2301(9)(A)(ii), (iii), and (x).

---

[4] Appellant was arrested with several hundred dollars on his person in addition to a small quantity of marijuana.

[5] Appellant had a felony conviction making it unlawful for him to possess a firearm. In addition to the handgun, appellant had marijuana in his possession.

[6] Appellant and S.R. had two other children besides Ta.C. who were in the custody of CFSA.

After a disposition hearing, the magistrate judge concluded that, despite reasonable efforts toward reunification, returning Ta.C. to appellant's custody would be "contrary to the welfare of the child."[7] Ta.C. was committed to the legal custody of CFSA.

On review, Associate Judge Becker reversed the finding of neglect under § 16-2301(9)(A)(iii), but upheld the findings of neglect under D.C. Code §§ 16-2301(9)(A)(ii) and (x), and affirmed Ta.C.'s commitment to the custody of CFSA.[8] Judge Becker rejected appellant's argument that the magistrate judge had based her findings of neglect "merely on [the] single incident" of the shooting on November 7, 2018. Rather, the judge said, the finding that Ta.C. was at substantial risk of serious harm from lack of proper parental care and control was sufficiently established by the facts that appellant had "regularly left [Ta.C.] in the care of an individual who sold drugs, with unsecured firearms nearby," in combination with the November 7 incident in which that individual was murdered in the child's presence. The judge held that the determination of neglect under § 16-2301(9)(A)(x) likewise was supported by the evidence that Ta.C. "was living in a home where some

---

[7] D.C. Code §§ 16-2320(f)(2)(A)-(B) (2012 Repl. & 2020 Supp.).

[8] The District has not appealed the reversal of the finding of neglect under § 16-2301(9)(A)(iii), and we therefore do not discuss it further.

members of the household dealt drugs and others 'tacitly approved' of that drug-selling," in which there was an unsecured firearm, and in which there had been a shooting that in all likelihood was drug-related.

## II.

The District bears the burden of proving a child neglected by a preponderance of the evidence.[9] We review the legal sufficiency of the District's proof with the recognition that the adjudication of neglect is a "fact-specific process" in which the trial court is in the best position to make credibility determinations and weigh the evidence before it.[10] The court appropriately evaluates and draws its conclusions from evidence extending "beyond . . . the most recent episode" triggering a neglect petition in order to consider, as much as feasible, "the 'entire mosaic' of the child's history and experience relevant to the allegations of neglect."[11]

---

[9] *In re A.H.*, 842 A.2d 674, 684 (D.C. 2004).

[10] *In re De.S.*, 894 A.2d 448, 452 (D.C. 2006).

[11] *In re M.D.*, 758 A.2d 27, 33 (D.C. 2000) (quoting *In re A.S.*, 643 A.2d 345, 347 (D.C. 1994)). We have said that a mere "snapshot" of a single moment or episode in a child's life may be misleading and "an unsatisfactory basis" for an adjudication of neglect. *In re A.H.*, 842 A.2d at 684-85.

Accordingly, our review of the legal sufficiency of the evidence supporting a finding of neglect is deferential to the prerogatives of the trier of fact and the broad ambit of the trial judge's discretionary judgment. We "'will reverse a finding of neglect only if it is plainly wrong or without evidence to support it,' and only after viewing the evidence in the light most favorable to the court's ruling."[12] But consistent with that deference, we must ensure that a finding of neglect "embod[ies] a correct understanding of the relevant statutory terms."[13] The proper construction of the neglect statute is a legal question, as to which our review is not deferential, but de novo.

### III.

A child may be found to be neglected within the meaning of D.C. Code § 16-2301(9)(A)(x) where the District shows that the child "is regularly exposed to illegal drug-related activity in the home." The neglect statute states that "[t]he term 'drug-related activity' means the use, sale, distribution, or manufacture of a drug or drug

---

[12] *In re A.B.*, 999 A.2d 36, 44 (D.C. 2010) (footnote omitted) (quoting *In re L.H.*, 925 A.2d 579, 581 (D.C. 2007)).

[13] *In re L.H.*, 925 A.2d at 581.

paraphernalia without a legally valid license or medical prescription."[14]  In *In re De.S.*, the only case in which this court previously has addressed a challenge to the sufficiency of the evidence underlying a finding of neglect under §16-2301(9)(A)(x), we upheld the finding where the record demonstrated that (1) police had received numerous neighborhood complaints that drug activities were taking place in the child's home; (2) an occupant of the home admitted to selling drugs from the home; (3) in a search of the home, police discovered drug paraphernalia, including pipes and empty Ziploc bags; and (4) the search of the home also uncovered a firearm and ammunition.[15]

We do not have comparable evidence of drug-related activity *in or emanating from* the Galveston Place apartment where appellant and Ta.C. were residing.  There was evidence that appellant and his roommate Johnson used and sold drugs, but no evidence or reports that they did so in or from that apartment.  The witnesses to appellant's apparent use or sale of drugs only observed it on occasions when they encountered him outside the apartment.  The police search of the apartment turned up no drugs, drug paraphernalia, or drug distribution materials of any kind, and no

---

[14]  D.C. Code § 16-2301(37).

[15]  *In re De.S.*, 894 A.2d at 450-52.

apparent monetary proceeds or records of drug sales.[16] The police did find an unsecured rifle and ammunition in Ta.C.'s bedroom closet, and the apartment was the scene of a break-in and the shooting of Johnson and Flood. It may be a fair surmise, in the absence of any other explanation, that the firearm, ammunition, and violence at the apartment were more likely than not linked in some way to the drug-related activities of one or more of its occupants. The exposure of a child to such dangers in the home is certainly highly relevant to whether the child should be removed from that home on account of drug-related activity occurring there.[17] But all that begs the essential question under D.C. Code §§ 16-2301(9)(A)(x) and 16-2301(37), which is whether the child was "regularly exposed" to the illegal "*use, sale, distribution, or manufacture* of a drug or drug paraphernalia" in the home.[18] The statute is quite specific. That appellant's and Johnson's unlawful drug-related activities may have jeopardized the safety of their home does not tell us those activities themselves took place in the home, or that Ta.C. was exposed to them

---

[16] *Cf. Hicks v. United States*, 697 A.2d 805, 807 n.3 (D.C. 1997) (noting that a large sum of cash discovered in appellant's bedroom was probative evidence of constructive possession of cocaine where it was discovered with drugs and other drug paraphernalia).

[17] *See In re De.S.*, 894 A.2d at 452-53; D.C. Code § 4-1301.06a(b) (2020 Supp.).

[18] D.C. Code § 16-2301(37) (emphasis added).

there, regularly or otherwise. We cannot rely on speculation to establish that necessary finding; the paucity of the evidence on these issues does not permit us to affirm the finding that Ta.C. was a neglected child under § 16-2301(9)(A)(x).

We do not, however, dismiss the relevance of appellant's and Johnson's drug activities. That a child has been knowingly exposed to violence or risks thereof attendant with a caregiver's illegal activities outside of the home may be sufficient for a finding of neglect under other definitions of neglect in the statute. In our view, this case presents such a scenario. It was the basis for Magistrate Judge Fentress and Judge Becker's agreement that Ta.C. was a neglected child because he was "without proper parental care or control" under D.C. Code § 16-2301(9)(A)(ii).[19] We may sustain adjudications of neglect under this provision if the court's decision rests on a finding that the child is exposed to a "substantial risk of serious harm."[20] A neglect finding under § 16-2301(9)(A)(ii) "does not require actual harm" to have befallen

---

[19] This provision also requires the District to show that "the deprivation is not due to the lack of financial means of his or her parent." D.C. Code § 16-2301(9)(A)(ii). Appellant makes no argument that proof as to this element of neglect was insufficient.

[20] *In re K.M.*, 75 A.3d 224, 233 (D.C. 2013) (quoting *In re A.H.*, 842 A.2d at 686).

the child; "such a finding can rest on a risk of physical or emotional injury that has not yet occurred."[21]

Appellant argues that Johnson's murder was the only evidence before the trial court that tended to show Ta.C. was exposed to a substantial risk of harm, and that the trial court improperly based its neglect determination on this "single snapshot of the family's existence."[22] We do not agree that the court's focus was so narrow; the trial court's finding took into account evidence covering several months of the child's life before and after the homicide that showed an increasingly unsafe living situation for the child.

The evidence showed that, during this time, appellant—Ta.C.'s primary caregiver—was experiencing serious substance abuse issues, which resulted at least twice in appellant's hospitalization. In the month before the neglect hearing, appellant was arrested for selling marijuana to an undercover police officer, and again for unlawful possession of a handgun. When appellant was observed in the community prior to the murder and Ta.C.'s removal from appellant's custody, Ta.C. was never with him. The child was regularly left in the custody of Mr. Johnson,

---

[21] *Id.*

[22] *In re A.H.*, 842 A.2d at 685.

whom appellant knew to be a drug dealer.  To say that Ta.C., a two-year-old child,

was at a substantial risk of serious harm while placed in such company is an

understatement, as the November 7 events proved.  Drug trafficking is inherently

dangerous, and while the record does not reveal the motive behind Johnson's

murder, we agree with the trial court that it is reasonable to infer it was related to

Johnson's (or, perhaps, appellant's) illegal drug-related activity.  The apartment at

39 Galveston Place was demonstrably an unsafe environment for Ta.C., and the

presence of an illegal and unsecured firearm and ammunition in Ta.C.'s bedroom

closet only confirmed and added to the very real dangers surrounding him.[23]  In the

---

[23] *See, e.g*, *In re Ninoshka M.*, 4 N.Y.S.3d 201, 201 (N.Y. App. Div. 2015) (finding of neglect supported by parent's storage of accessible and illegal firearms in the home).  We acknowledge that the mere presence of a firearm and ammunition in a child's home is not by itself evidence of neglect.  In general, firearms in the home are probative of neglect only where they are operable and accessible to children who might misuse them.  *Compare In re Yolanda L.*, 212 Cal. Rptr. 3d 839, 844 (Cal. Ct. App. 2017) (father's storage of loaded handgun in area accessible to his children was "neglectful conduct" that put the children "at substantial risk of suffering serious physical harm") *with In re C.V.*, 222 Cal. Rptr. 3d 924, 929-30 (Cal. Ct. App. 2017) (unloaded gun secured and hidden from three-month old insufficient evidence of a "substantial risk of serious harm") *and M.S. v. Dep't of Children & Families*, 60 So. 3d 573, 575 (Fla. Dist. Ct. App. 2011) (unsecured firearms in locked room to which children had no access insufficient basis on which to find neglect).  In this case, the rifle was readily accessible to Ta.C., there is no evidence that the rifle was inoperable, and there was ammunition nearby, on the top shelf of the closet but still potentially accessible to even a small child.  Appellant's possession of the rifle was unlawful, and it was potentially linked to other dangerous and illegal activities by one or more of the occupants of Ta.C.'s abode.  Under such circumstances, we think the trial court appropriately considered the firearm as contributing to the conclusion that Ta.C. was at a substantial risk of harm in

wake of Johnson's murder, appellant's further criminal activity, unlawful handgun possession, and apparently unalleviated history of substance abuse, combined with Ta.C.'s loss of his alternative caregiver, shows that the risk of harm to Ta.C. if he remained in his father's custody was substantial and not at all speculative or temporary.[24] Viewing the "entire mosaic of the child's history and experience," the court did not err in concluding Ta.C. was without proper parental care or control.[25]

## IV.

For the foregoing reasons, we affirm the trial court's order adjudicating Ta.C. a neglected child.

---

appellant's care. That said, we would affirm a finding of neglect on the facts of this case even if the rifle and ammunition had not been found in Ta.C.'s home.

[24] This is in contrast with cases in which we have held the evidence insufficient to support a finding of neglect based on the alleged lack of proper parental care or control. *See, e.g.*, *In re L.H.*, 925 A.2d at 582-83 (reversing trial court's finding that child was without proper parental care or control where evidence of physical punishment beyond a single incident rested "on too much speculation to support a finding of neglect"); *In re K.M.* 75 A.3d at 234 (evidence of what "could happen to a child . . . of a parent . . . suffering from a delusional disorder" too speculative to support a finding of neglect of the child at issue) (internal quotation marks omitted).

[25] *In re M.D.*, 758 A.2d at 33 (internal quotation marks omitted).